UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  CASE NO. 8:15-cr-93-MSS-AEP

STEPHEN FARRIS UNDERWOOD

**UNITED STATES' RESPONSE IN OPPOSITION TO STEPHEN UNDERWOOD'S MOTION FOR COMPASSIONATE RELEASE**

The United States opposes Stephen Farris Underwood's motion for compassionate release pursuant to 18 U.S.C. § 3582(a)(1)(A). Because the statutory sentencing factors of 18 U.S.C. § 3553(a) weigh heavily against his release, the Court should deny his motion.

I. **Background**

On November 7, 2014, Underwood picked up T.H., then a 15-year-old boy, in Mountain View, Missouri, and drove him approximately 1,000 miles to Tampa, Florida, with the intent to engage in criminal sexual activity with him. PSR at ¶¶ 18, 23-24. Between November 7, 2014 and November 18, 2014, Underwood, then a 46-year-old man, engaged in various sexual acts with T.H, a child 31 years his junior, including oral sex and digital-rectal penetration. *Id.* at ¶¶ 14, 18, 22-24

1

On November 18, 2014, more than a week after T.H. was reported missing by his parents, he was located by law enforcement officers at Underwood's residence in Tampa, Florida. *Id*. ¶¶ at 19-22. T.H. was reunited with his parents, and Underwood was federally indicted for crimes related to his exploitation of T.H. Doc. 1. Underwood later pled guilty to transporting a minor with the intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a), and was sentenced to 235-months imprisonment (the low-end of his sentencing guidelines) and a lifetime of supervised release. Docs. 18 and 34.

Underwood is 51 years old and is presently incarcerated at Coleman Low FCI, with a projected release date of October 27, 2031. *See* BOP Inmate Locator at https://www.bop.gov/inmateloc/ (last accessed on August 24, 2020). After serving *less than* one-third of his sentence, Underwood now moves this Court for immediate "compassionate release" from imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A) due, primarily, to health concerns stemming from the COVID-19 pandemic. Doc. 41.

The United States is cognizant of inmate concerns stemming from COVID-19. Neither the United States, nor the Bureau of Prisons (BOP), minimize the concern or risk; this unique situation is being diligently monitored. The BOP has taken aggressive action to mitigate the effects of COVID-19, and

has been taking proactive steps to prevent potential coronavirus transmissions for months. As detailed below, the United States opposes Underwood's requested relief.

## II. The BOP's response to COVID-19.

COVID-19 is a dangerous illness that, in a short time, has caused many deaths in the United States and a massive disruption to our society and economy. The BOP continues to take significant measures to protect the health of the inmates in its charge. To aid this Court in its consideration of Underwood's motion, a summary of the BOP's response to COVID-19 follows.

The BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. *See* BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed. It establishes a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak

overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, the BOP began planning for potential coronavirus transmissions in January 2020 by establishing a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned space in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will

limit transmissions of the disease. Likewise, all official staff travel has been canceled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g., medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of the BOP. Any

contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13 and remain suspended to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased inmates' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits are permitted on a case-by-case basis after infection screening in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

### III. As part of its response to COVID-19, the BOP may designate certain inmates to a term of home confinement.

In an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, the BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an

inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance the BOP's flexibility to respond to the pandemic. Under the CARES Act, enacted on March 27, 2020, the BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General gave the BOP Director the authority to exercise this discretion, beginning at the facilities that so far have seen the greatest incidence of coronavirus transmission. *See* April 3, 2020 Memorandum to Director of Bureau of Prisons.[1] As of this filing, BOP has transferred 7,593 inmates to home confinement. *See* Federal Bureau of Prisons, COVID-19 Home Confinement Information, at https://www.bop.gov/coronavirus/ (last accessed on August 24, 2020).

---

[1] BOP has described its increased use of home confinement on its website: https://www.bop.gov/coronavirus/faq.jsp. Inmates do not need to apply to be considered for home confinement. BOP Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General. While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in BOP institutions. The BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling incarceration orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But the BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## IV. The legal framework of Underwood's compassionate release request.

A court may reduce a term of imprisonment upon finding "extraordinary and compelling circumstances," consistent with applicable policy statements of the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A). Under the statute, as amended by Section 603(b) of the First Step Act, this Court may act "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

The Sentencing Commission's policy statement addressing sentence reductions under § 3582(c)(1)(A) provides examples of qualifying "extraordinary and compelling reasons" including (1) terminal illness; (2) a serious medical condition that substantially diminishes the ability of the defendant to provide self-care in prison; or (3) the death of the caregiver of the defendant's minor children. *See* USSG §1B1.13 comment. (n.1).[2] Even when an

---

[2] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by

9

extraordinary and compelling reason exists, however, a court should only grant a motion for release if it determines that the defendant is not a danger to the public. USSG §1B1.13(2).

Previously, only the BOP could file a motion for compassionate release. The First Step Act amended the provision to permit a defendant to bring a motion upon the *earlier* of either (1) the exhaustion of all administrative rights to appeal the BOP's failure to bring a motion to reduce his sentence (the exhaustion requirement) *or* (2) the lapse of 30 days from the BOP's receipt of the defendant's request that the BOP bring such a motion (the lapse requirement). *See* First Step Act of 2018, 115 P.L. 391, § 603(b)(1); *see also United States v. Gardner,* 2020 WL 1673315, at *1 (D. Minn. Apr. 6, 2020).[3]

---

BOP, the policy statement applies to motions filed by defendants as well.

[3] Some courts–including some within the Middle District of Florida—have held that, if the warden denies a request during the first 30 days, the inmate cannot proceed to court until administrative remedies are fully exhausted. *See United States v. Read*, 2020 WL 3103983, *2 (M.D. Fla. June 11, 2020) (J. Chappell); *United States v. Raftopoulos*, 2020 WL 3064793, *3 (M.D. Fla. June 9, 2020) (J. Antoon); *United States v. Rodriguez-Begerano*, 2020 WL 3000737, *2 (M.D. Fla. June 4, 2020) (J. Covington); *United States v. Chappell*, 2020 WL 2573404, *1–2 (M.D. Fla. May 21, 2020) (J. Covington); *United States v. Eyerman*, 2020 WL 2466189, *2–3 (M.D. Fla. May 13, 2020) (J. Steele); *United States v. Weidenhamer*, 2020 WL 1929200 (D. Ariz. Apr. 21, 2020); *United States v. Miller,* 2020 WL 113349 (D. Idaho Jan. 8, 2020); *United States v. Elgin*, 2019 U.S. Dist. LEXIS 86571, *3 (N.D. Ind. May 23, 2019); *United States v. Watson*, 2020 WL 1890541, at *3 (N.D. Okla. Apr. 16, 2020); *United States v. Hilton*, 2020 WL 836729 (M.D.N.C. Feb. 20, 2020); *United States v. Nance*, 2020 WL 114195 (W.D. Va. Jan. 10, 2020); *United States v. Mendoza*, 2019 WL 6324870, at *4 (D. Minn. Nov. 26, 2019); *United States v. Becks*, 2019 U.S. Dist. LEXIS 111051, *2–3 (D. Neb.

Once either the exhaustion or lapse requirement is met, a court may reduce a defendant's term of imprisonment after considering whether the 18 U.S.C. § 3553(a) factors weigh in favor of release. *See* 18 U.S.C. § 3582(c)(1)(A); USSG §1B1.13. Reductions may be granted if (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." Section 3582(c)(1)(A)(i). As the movant, Underwood bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Heromin*, 8:11-cr-550-T-33SPF, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (J. Covington); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (holding that a movant for a reduction under § 3582(c)(2) bears the burden to establish a reduction is warranted).

Underwood's motion and BOP records reflect that he submitted a Reduction in Sentence Application to his facility's Warden in June 2020, and the Warden denied his application on June 16, 2020. *See* Doc. 41-1 at 8-9. Underwood then filed the instant motion on August 12, 2020. *See* Doc. 41. As

---

July 3, 2019) (held as matter of discretion). However, the Department's views the plain language of the First Step Act to allow an inmate to file a motion after 30 days have passed since the request was made to the warden, *or* after exhausting administrative review, *whichever is earlier. See* First Step Act of 2018, 115 P.L. 391, § 603(b)(1); *United States v. Gray*, 416 F. Supp. 3d 784, 787–88 (S.D. Ind. Sept. 20, 2019); *United States v. Gardner*, 2020 WL 1673315, at *1 (D. Minn. Apr. 6, 2020).

more than 30 days have passed between Underwood's submission of his original application and the filing of the instant motion, Underwood has satisfied the lapse requirement, and this this Court may consider the merits of Underwood's request.

V.  **Underwood has identified extraordinary and compelling reasons for compassionate release.**

As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG §1B1.13, comment. n.1(A).

To state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that a condition that falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "*serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.*" USSG §1B1.13, comment. n.1 (A) (emphasis added). If a

defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), the motion must be denied.

The mere existence of the COVID-19 pandemic—which poses a general threat to every non-immune person in the country—does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 954 F.3d at 597; *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).")).[4] To classify COVID-19 as an

---

[4] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such

extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to the BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where detention otherwise would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008) (considering pretrial detention).

A defendant seeking compassionate release bears the burden of establishing that release is warranted. *United States v. Heromin*, 8:11-cr-550-T-33SPF, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (J. Covington); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (holding that a

---

a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

14

movant for a reduction under § 3582(c)(2) bears the burden to establish a reduction is warranted).

Underwood has asserted that he presently suffers from emphysema and that makes him more vulnerable to becoming seriously ill should he contract COVID-19. Doc. 41 at 1. Indeed, a physician at Underwood's facility of incarceration has confirmed to the undersigned that Underwood does in fact suffer from chronic pulmonary emphysema (also known as chronic obstructive pulmonary disease or "COPD") due to his long history of smoking, but the physician noted that Underwood's condition is in remission and does not presently require medical management like inhalers, steroids, or oxygen. As such, but for the COVID-19 pandemic, Underwood would present no basis for compassionate release, as his medical ailment is well-controlled and does not present any impediment to his ability to provide self-care in the institution.

The only question, then, is whether the risk of COVID-19 changes that assessment. The United States acknowledges that Underwood's emphysema/COPD diagnosis presents a risk factor identified by the CDC as heightening the risk of severe injury or death were the inmate to contract COVID-19. *See* "People With Certain Medical Conditions" at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed August 24, 2020). Pursuant to

current Department of Justice policy, this fact *alone* is enough to satisfy Underwood's burden of demonstrating an extraordinary and compelling circumstance during the COVID-19 pandemic. Therefore the United States concedes that Underwood's chronic condition of emphysema/COPD, by itself, presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in section 1B1.13, comment n.1(A)(ii), in that at this time the inmate's ability to provide self-care against serious injury or death as a result of COVID-19 is substantially diminished, within the environment of a correctional facility.

VI. **Even though there are medical reasons supporting Underwood's release, the applicable § 3553(a) factors weigh against granting such relief.**

Underwood's request for a sentence reduction should be denied because he has failed to demonstrate that he is not a danger to the safety of the community or otherwise merits release under the § 3553(a) factors, which strongly weigh against granting compassionate release. Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG §1B1.13(2). Additionally, this Court must consider the §

3553(a) factors, as "applicable," as part of its analysis. 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

Underwood's offense conduct alone demonstrates that he is still a danger to the community. Less than six years ago, Underwood drove approximately 2,000 miles (from Florida to Missouri and back), to lure and then sexually exploit T.H., a vulnerable 15-year-old boy he met online. Over the course of 11 days, Underwood sexually gratified himself by repeatedly molesting T.H., all while T.H.'s devastated parents did not even know "where [T.H.] was, if he was ok[ay], hurt or dead." *See* PSR at 18 (letter to the Court from C.R., mother of T.H.). Underwood's claims that he has learned his lesson in prison and is no longer a risk to the community are self-serving platitudes that provide no meaningful assurance to this Court, his victim, or the community, that he will not re-offend if given the opportunity.

Moreover, Underwood has served *less than one-third* of his originally imposed sentence for a very significant offense. Permitting his release now, when he has not even served the 120-month minimum mandatory sentence Congressionally mandated for his offense of conviction, would not adequately punish him for his conduct, would not adequately reflect the seriousness of his crime, and would not adequately deter those considering engaging in similar crimes. *See* 18 U.S.C. § 3553(a).

Further, Underwood's premature release would infringe on his victim's right to reasonable protection provided under the Crime Victims' Rights Act (CVRA), which specifies that crime victims have "[t]he right to be reasonably protected from the accused." 18 U.S.C. § 3771(a)(1). The CVRA requires that the Court "ensure that the crime victim is afforded the rights" contained therein, which rights include "the right to reasonable, accurate, and timely notice of any public court proceeding" involving the defendant's release. 18 U.S.C. §§ 3771(a)(2), (b)(1).

### VII. Conclusion

For the foregoing reasons, this Court should deny Underwood's motion for compassionate release.

    Respectfully submitted,

    MARIA CHAPA LOPEZ
    United States Attorney

By: *Simon R Eth*

    Simon R. Eth
    Assistant United States Attorney
    Florida Bar No. 0091415
    2110 First Street, Suite 3-137
    Ft. Myers, Florida 33901
    Telephone: (239) 461-2200
    Facsimile: (239) 461-2219
    E-mail: simon.eth@usdoj.gov

U.S.A. v. Stephen Underwood	Case No. 8:15-cr-93-MSS-AEP

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2020, a true and correct copy of the foregoing document and the notice of electronic filing were sent by United States Mail to the following non-CM/ECF participant(s):

Stephen Farris Underwood
# 62234-018
FCI Coleman Low
P.O. Box 1031
Coleman, FL 33521


*Simon R. Eth*

Simon R. Eth
Assistant United States Attorney
Florida Bar No. 0091415
2110 First Street, Suite 3-137
Ft. Myers, Florida 33901
Telephone:   (239) 461-2200
Facsimile:   (239) 461-2219
E-mail:      simon.eth@usdoj.gov